# EXHIBIT A

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 2 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 1 of 33
PageID #: 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | Case No. |
| **Plaintiff,** | **COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| **v.** | |
| **FIRST STATE DEPOSITORY COMPANY, LLC, ARGENT ASSET GROUP LLC, AND ROBERT LEROY HIGGINS,** | |
| **Defendants.** | |

Plaintiff Commodity Futures Trading Commission ("Commission"), by its attorneys, alleges as follows:

## I.   INTRODUCTION

1.     From at least January 2014 through the present (the "Relevant Period"), Defendants First State Depository Company, LLC ("FSD"), Argent Asset Group LLC ("Argent"), both by and through their employees and agents, including Robert Leroy Higgins ("Higgins"), and Higgins directly (collectively, "Defendants") engaged in a fraudulent and deceptive scheme (the "Scheme") in connection with the purchase and sale of precious metals, including but not limited to the purchase and sale of silver coins as part of a fraudulent silver leasing program known as the "Maximus Program."

2.     In the course of operating the Maximus Program, Defendants deceived participants in the Maximus Program ("Maximus Customers") and participants in a parallel lease program called the Silver Lease Program ("Silver Lease Customers") that was primarily operated

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 3 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 2 of 33
PageID #: 11

by a non-party referred to herein as Metals Dealer 1, and its CEO, Individual 1.[1]  Although all of

the silver involved in the Silver Lease Program became part of the Maximus Program, the

Maximus Program was not limited to metal owned by Silver Lease Customers.

3.    In carrying out the Scheme, Defendants:

a.  misappropriated Customer funds and assets;

b.  led Customers to believe that their metal was held at FSD, when in fact it was
   not;

c.  led Customers to believe that Defendants had obtained silver for Customers,
   when in fact they had not;

d.  misappropriated funds and assets belonging to certain non-Customer clients
   ("Clients"), and deceived those Clients when they asked FSD to return their
   assets; and

e.  deceived Customers and Clients regarding the insurance coverage that FSD
   maintained for Customers and Client assets, including by leading Customers
   and Clients to believe their assets were fully insured for 100% of their value,
   when in fact they were not.

4.    Through this Scheme, Defendants fraudulently solicited and obtained at least

$7,000,000 in cash, silver, and other assets from at least 200 Customers in the Programs, and a

substantial amount of cash, silver, gold, and assets from other Clients.

5.    By virtue of this conduct, Defendants violated Section 6(c)(1) of the Commodity

Exchange (the "Act"), 7 U.S.C. § 9(1), and Commission Regulation 180.1, 17 C.F.R. §

180.1(a)(1)-(3) (2021).

---

[1] The Complaint uses the term the "Programs" to refer to the Maximus Program and the Silver Lease Program
together, and the term "Customers" to apply to either Maximus Customers or Silver Lease Customers.

Case 2:22-mc-00952  Document 1  Filed 10/07/22  Page 4 of 34
Case 1:22-cv-01266-RGA *SEALED*  Document 2 *SEALED*  Filed 09/27/22  Page 3 of 33
PageID #: 12

6.      Higgins is directly liable for acts and omissions he committed in furtherance of the Scheme.  Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Higgins is also liable for FSD and Argent's violations of Section 6(c)(1) and Commission Regulation 180.1(a)(1)-(3) because he controlled FSD and Argent, directly or indirectly, and because he either did not act in good faith or knowingly induced their acts or omissions.

7.      The acts, omissions, and failures of Argent's employees and agents alleged herein, including Higgins, occurred within the scope of their employment, agency, or office with Argent.  Therefore, Argent is liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2021), as principal for the violative actions and omissions of Argent's employees and agents, including Higgins.

8.      The acts, omissions, and failures of FSD's employees and agents alleged herein, including Higgins, occurred within the scope of their employment, agency, or office with FSD. Therefore, FSD is liable pursuant to Section 2(a)(1)(B) of the Act and Commission Regulation 1.2, as principal for the violative actions and omissions of FSD's employees and agents, including Higgins.

9.      Furthermore, FSD and Argent did not conduct business separately and at arm's length, but rather operated as a common enterprise with each other.  Higgins was the control person of that common enterprise.  Higgins owned both FSD and Argent and had ultimate decision-making authority over the business of both companies.

10.     The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties, restitution, and remedial ancillary relief, including, but not limited to, trading

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 5 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 4 of 33
PageID #: 13

and registration bans, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary or appropriate.

11.    Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.    JURISDICTION AND VENUE

12.    Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief in United States district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that district courts "shall have jurisdiction to entertain such actions." This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1345 (United States as plaintiff).

13.    Venue lies properly with this Court pursuant to Section 6c(e) of the Act because Defendants can be found in this District, transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

## III.    THE PARTIES

14.    Plaintiff **Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pt. 1–190 (2021).

15.    **Defendant Robert Leroy Higgins** is the owner, operator, principal, and control person for FSD and Argent. Higgins holds himself out as, and in fact is, the owner and manager of both FSD and Argent. Higgins controls and is the signatory on the bank accounts of FSD and

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 6 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 5 of 33
PageID #: 14

Argent.  Higgins communicates extensively with Customers, Clients, and business partners on behalf of both FSD and Argent.  Higgins employs or employed his sons, the fiancée of one of his sons, his sister, and his wife in the business of FSD and Argent.  Higgins never been registered with the Commission in any capacity.

16.     **Defendant First State Depository Company, LLC** is a Delaware limited liability company, organized on or about January 25, 2006, with an address of 100 Todds Lane, Wilmington, Delaware.  FSD's website describes itself as a "private depository" that offers "a full range of precious metals custody, shipping and accounting services to both commercial and individual participants in the rare coin and precious metals markets."  FSD provides depository storage services to Customers, but also stores precious metals and valuables for a number of Clients whose assets are not part of the Programs.  FSD has never been registered with the Commission in any capacity.

17.     **Defendant Argent Asset Group LLC** is a Delaware limited liability company, organized on or about September 24, 2013, with an address of 100 Todds Lane, Wilmington, Delaware.  Argent engages in the business of buying, selling, and leasing coins, bullion, bars, and other precious metals, and touts itself as a "leading numismatic and precious metals trading firm."  Argent has never been registered with the Commission in any capacity.

## IV.     RELEVANT NON-PARTIES

18.     **Metals Dealer 1** is a company based in Kansas that specializes, among other things, in the sale and promotion of precious metals as an investment vehicle, including for individuals wishing to invest in precious metals individual retirement accounts ("IRAs").  Many of Metals Dealer 1's customers entered the Silver Lease Program so that they could obtain monthly income from metal they deposited in an IRA.

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 7 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 6 of 33
PageID #: 15

19.     **Individual 1** is the owner, chief executive officer, and control person of Metals Dealer 1.

## V.     FACTS

### A.     Defendants Operated as a Common Enterprise

20.     FSD and Argent did not conduct business at arm's length or observe corporate formalities, but rather were commonly controlled by Higgins.

21.     Higgins owns both companies, and he serves as the managing member, president, or chief executive officer of both companies.

22.     Although Higgins on occasion told counterparties that the companies were separate and that he had no control over FSD, that was not true.  In other communications Higgins held himself out to third parties as owner, manager, President, or CEO of FSD.

23.     Higgins also conducted business on FSD's behalf throughout the Relevant Period. Higgins communicated with Customers, Clients, and other counterparties on FSD's behalf, including, for example, by communicating with Customers regarding the return or distribution of assets stored at FSD, and communicating with FSD's insurance brokers and underwriters regarding FSD's insurance policies.

24.     In addition, Higgins was the primary or an authorized signer on FSD's and Argent's bank accounts, and the primary credentials for online access to FSD's and Argent's bank accounts were in his name.

25.     FSD and Argent commingled corporate funds—on various occasions throughout the Relevant Period, Argent paid bills for FSD or wired money to FSD in order to ensure its bank account balance remained positive.  FSD and Argent also transferred Customer funds between them.

26.     FSD and Argent shared the same address and office at 100 Todds Lane.

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 8 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 7 of 33
PageID #: 16

27.     FSD and Argent also shared employees, consultants, or agents, including Higgins, who owned, operated, and controlled both entities.  Higgins installed one of his sons ("Son No. 1") as nominal operational head of FSD and another son ("Son No. 2") as nominal operational head of Argent.  Higgins' sister performed services on behalf of both FSD and Argent, and another of his sons ("Son No. 3") and Higgins' wife worked for FSD and/or Argent at various points during the Relevant Period.

**B.     Argent's Maximus Program**

28.     Starting in or around November 2013, Argent and Higgins promoted an investment program called the Maximus Program and solicited individuals to participate in it. The Maximus Program purported to offer Customers guaranteed monthly payments in exchange for their agreement to lease to Argent silver that the Customers purchased or owned.  Maximus Customers were supposed to receive a monthly "lease" payment based on a sliding scale that in part depended on the amount of silver the Maximus Customers leased to Argent.

29.     All of the leased silver in the Maximus Program was in the form of American Silver Eagles ("ASEs").[2]  The ASE, also referred to as a "Silver Eagle" or "SAE," is the official silver bullion coin issued by the United States Mint.  Each coin weighs one ounce and is a minimum of 99.9% pure silver.  The weight and purity of ASEs is guaranteed by the United States government.

30.     Prospective Maximus Customers could join the Maximus Program by either: (1) transferring funds to Argent in order to purchase ASEs that could then be pledged to the Maximus Program, (2) transferring ASEs the prospective Customer already owned to Argent or FSD to be pledged to the Maximus Program, or (3) transferring coins, bullion, or other assets to

---

[2]  This complaint uses the term "Leased Silver" to refer to the ASEs that were part of either the Maximus Program or the Silver Lease Program.

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 9 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 8 of 33
PageID #: 17

Argent or FSD to be exchanged for ASEs that would be pledged to the Maximus Program.  In

marketing materials, internal memoranda, and on Higgins' LinkedIn, Argent described the

Maximus Program as follows:

> Investors who own physical silver or have a desire to purchase silver and hold the
> investment over a medium to longer term, can obtain an added benefit by
> participating in our Maximus Silver Program.  In this program investors can enter
> into a leasing agreement with The Argent Group in monthly intervals.  During
> each month you participate in the program, investors will benefit a minimum
> fixed rate on the number of ounces utilized by The Argent Group.  Over 12
> months, utilizing the minimum 5000 ounces required to sign up for this program,
> an additional annual income of $4,500 would result, regardless of any price
> movement in Silver. . . A storage agreement at [FSD] is the only other
> requirement.

31.     Maximus Customers signed an agreement with Argent that was known and

referred to as the "Maximus Agreement" or "Maximus Silver Agreement."  The Maximus

Agreements set forth the terms and conditions of the leasing relationship and included various

representations and warranties.  Maximus Customers also entered into a Depository Account

Agreement with FSD regarding the purported storage of assets at FSD.

**C.     Metals Dealer 1's Silver Lease Program**

32.     In February 2014, Argent entered into a Maximus Agreement with Metals Dealer

1, an entity owned and controlled by Individual 1.  Pursuant to the Maximus Agreement between

Argent and Metals Dealer 1, Argent agreed to pay Metals Dealer 1 twenty cents ($0.20) per

month for each ASE that Metals Dealer 1 pledged to the Maximus Program.  Higgins told Metals

Dealer 1 that Argent used the Leased Silver to fulfill short-term sales of ASEs to third parties as

needed, and that if Leased Silver was sold, an equivalent amount of ASEs would promptly be

returned to the account.

33.     At or around the same time, Metals Dealer 1 began soliciting prospective

Customers for a silver leasing program of its own that operated in parallel to Argent's Maximus

Program.  Metals Dealer 1's program was typically referred to as the Silver Lease Program, but was on occasion referred to as the Silver Deposit Account.  The result of this arrangement was a set of back-to-back leases, through which Metals Dealer 1's customers leased ASEs to Metals Dealer 1, and Metals Dealer 1 exclusively leased those ASEs to Argent.

34.     The Silver Lease Program mirrored the Maximus Program in several ways.

35.     *First*, in order to participate in the Silver Lease Program, Customers were required to sign a lease agreement with Metals Dealer 1 ("Lease Agreement"), which provided that the Customers would lease to Metals Dealer 1 the silver described in the Lease Agreement. Customers also signed a Depository Account Agreement with FSD regarding the purported storage of assets at FSD.

36.     *Second*, all of the silver pledged to the Silver Lease Program was in the form of ASEs.

37.     *Third,* prospective Silver Lease Customers could join the Silver Lease Program by either:  (1) sending money to Metals Dealer 1 to purchase ASEs; (2) sending ASEs they already owned to FSD and pledging them to the Silver Lease Program; or (3) exchanging other coins, bullion, or assets for ASEs and pledging those ASEs to the Silver Lease Program.

38.     Some Silver Lease Customers invested through self-directed IRAs.  Metals Dealer 1 utilized a designated IRA custodian ("IRA Custodian") to administer Silver Lease Customers' IRA accounts.  Although the IRA Custodians technically administered the IRAs, their role was limited to overseeing and authorizing transactions into and out of the accounts. The IRA Custodians did not physically possess or hold the assets that were in the IRAs (including the ASEs that were part of the Silver Lease Program).  For most of the Relevant

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 11 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 10 of 33
PageID #: 19

Period, one IRA Custodian ("IRA Custodian 1") served as the sole IRA Custodian for the Silver

Lease Program.

39.     *Fourth*, Metals Dealer 1 agreed to provide Silver Lease Customers with

consideration in exchange for their agreement to lease ASEs to Metals Dealer 1.  In the original

iterations of Metals Dealer 1's Lease Agreements, Metals Dealer 1 agreed to pay any storage,

shipping and IRA custodial fees that Silver Lease Customers incurred, but did not agree to make

a monthly payment.  At some point thereafter, however, Metals Dealer 1 agreed to provide Silver

Lease Customers with a monthly payment of between one cent and ten cents per ASE invested in

the Silver Lease Program, with the rate set in tiers based on the quantity of the ASEs leased to

Metals Dealer 1 (the "Silver Lease Payment").  For example, a Silver Lease Customer who

pledged between 1,000 and 1,999 ASEs received a monthly payment of $0.01 per coin; a Silver

Lease Customer who pledged between 9,000 and 9,999 ASEs received a monthly payment of

$0.09 per coin, and a Silver Lease Customer who pledged more than 10,000 ASEs received a

monthly payment of $0.10 per coin.  Silver Lease Customers had the option to receive this

monthly payment in cash, or instead to have additional ASEs put into their account.

40.     From 2014 to present, Silver Lease Customers collectively sent millions of dollars

of money, silver, or other assets to Metals Dealer 1 or FSD to join the Silver Lease Program.

There are presently more than 200 Silver Lease Customers who collectively have more than

600,000 ASEs in the Silver Lease Program, worth more than $10 million at present market

prices.

41.     Although certain iterations of the Lease Agreements were silent as to what Metals

Dealer 1 intended do with the Leased Silver, and others permitted Metals Dealer 1 to transfer the

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 12 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 11 of 33
PageID #: 20

Leased Silver to non-specified "customers desiring to purchase silver," in every case and without fail, Metals Dealer 1 pledged the Leased Silver to the Maximus Program.

42.   In other words, Metals Dealer 1 essentially served as a vehicle for directing ASEs to Argent's Maximus Program.  Consequently, a large majority of the ASEs in the Maximus Program came from Metals Dealer 1 and Silver Lease Customers.  In light of Argent's agreement to pay Metals Dealer 1 $0.20 for each ASE pledged to the Maximus Program, Metals Dealer 1's Silver Lease Payments to Customers were essentially a pass-through arrangement in which Argent paid $0.20 to Metals Dealer 1 for each ASE that Silver Lease Customers held, and Metals Dealer 1 paid up to $0.10 per ASE to Silver Lease Customers, keeping the rest as profit.

43.   The way this worked in practice was that in instances where a Silver Lease Customer possessed ASEs it wanted to pledge to the Silver Lease Program, the ASEs were physically shipped to FSD and pledged to the Programs.  In other instances, Customers delivered precious metals directly to FSD, who released the metal to Argent to nominally be exchanged for ASEs that would be pledged to the Programs.  For Customers who joined the Silver Lease Program by purportedly purchasing ASEs with money, the Customers sent their funds to Metals Dealer 1, which forwarded money to Argent for the purpose of purchasing ASEs.  These Customers were provided with invoices and other documents indicating that Metals Dealer 1 purchased silver on their behalf and that their Leased Silver was stored at FSD.

44.   Upon information and belief, Silver Lease Customers were not typically aware that all of their Leased Silver had been pledged by Metals Dealer 1 to the Maximus Program.  If Silver Lease Customers asked how leasing of the Leased Silver worked, Metals Dealer 1 told them the same thing that Higgins told Metals Dealer 1—that the Leased Silver was used to fulfill short-term sales of ASEs as needed, but that if this occurred, an equivalent amount of ASEs

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 13 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 12 of 33
PageID #: 21

would promptly be returned to their account. Based on representations by Defendants, Metals
Dealer 1 also told Silver Lease Customers that their ASEs were insured for 100% of their value
and stored in physically segregated storage at FSD.

**D.     Defendants' Scheme**

45.     Throughout the Relevant Period, Defendants engaged in a fraudulent and
deceptive scheme that involved misappropriation of Customer and Client assets, false and
misleading representations to Customers and Clients, and other deceptive conduct. Defendants
falsely led Customers to believe their ASEs were securely stored at FSD and falsely led certain
Customers to believe that Defendants had obtained ASEs for those Customers. Defendants also
failed to sufficiently insure the assets that FSD held in order to protect them from risk of loss,
and in doing so deceived Customers and Clients about FSD's insurance coverage. In at least one
instance, Defendants misappropriated a Client's assets, and deceived that Client when it
attempted to remove its assets from FSD. All of these deceptions were material. As FSD itself
said in marketing materials:

> We know that asset safety, transaction accuracy and expeditious fulfillment are of
> paramount importance to every depository customer, whether they are
> commercial enterprises conducting frequent, high volume business transactions or
> individuals simply seeking a highly secure facility to hold their personal coin and
> bullion investments.

46.     Despite this assurance, Defendants did not report transactions accurately, fulfill
transactions expeditiously, or sufficiently insure Customer and Client assets to protect them from
risk of loss.

**1.     Fraud and Deception Regarding ASEs Held at FSD**

47.     Defendants led Customers to believe that their ASEs were held securely at FSD.
FSD's website unequivocally states that "your coins and bullion always remain physically stored
in our depository, in your account and your legal property at all times." Metals Dealer 1's Lease

Agreements stated that Customers were leasing "silver coins held on deposit at FSDC," and certain Lease Agreements stated that Metals Dealer 1 "shall maintain, in FSDC's possession and/or control, the specific property borrowed or property of similar nature that is fungible with the property borrowed."  The Leased Silver that Metals Dealer 1 pledged to Argent through the Maximus Program was also purportedly stored at FSD, and Argent's Maximus Agreements (both with Metals Dealer 1 and with other Maximus Customers) required Argent to "maintain, in its possession and/or control, the specific property borrowed or property of similar nature that is fungible with the property borrowed."

48.     Metals Dealer 1 appears to have taken these representations at face value. Individual 1 believed that the ASEs in the Silver Lease Program were physically stored at FSD. If a Silver Lease Customer asked where their ASEs were stored, Individual 1 would tell them "they are in a segregated 100 percent insured account in their physical form, and if you wanted to actually go to Wilmington, Delaware to physically see your metal . . . that can be arranged."  As noted above, Higgins led Individual 1 to believe that the Leased Silver might be temporarily removed from a Customer's account in order for Argent to sell ASEs to a third party, but that if that happened, the Leased Silver would be replaced or replenished shortly thereafter.

49.     If Argent removed Leased Silver from Customer accounts, that fact should have been disclosed to Customers.  In marketing materials, FSD told prospective clients they would receive transaction confirmations that reported the movement of their assets, and account statements that reflected their holdings, so that "the account owner always knows the exact status of all holdings secured at First State."  FSD's website says that "ALL of our transactions are fully transparent" and that FSD offers "full disclosure, [and] accurate and timely reporting." Similarly, in its Depository Account Agreements with Metals Dealer 1 and Customers, FSD

agreed to provide "monthly statements . . . summarizing . . . account balances by Asset type," and to "provide Client with written confirmation of transactions that occur in Client's Account each day."

50.     FSD did send Customers weekly or monthly "Holdings Reports" that purported to show each Customer's account balance and holdings at FSD, and "Activity Reports" that were purportedly distributed every time a transaction occurred in their account (collectively, the "Reports"). These Reports did not show the "temporary" movement of ASEs into and out of the account as they were purportedly leased and returned. Instead, FSD sent Customers Holdings Reports showing ASEs being transferred into a Customer's account and essentially remaining there permanently. The Activity Reports indicated the same thing. Almost the only activity reflected in the Reports—aside from purchases or sales that Customers themselves initiated— was the monthly addition of ASEs to the accounts of Silver Lease Customers who elected to receive their Silver Lease Payment in the form of additional ASEs, rather than cash.

51.     FSD represented that it was "fully transparent" in reporting transactions, that it engaged in "full disclosure" and "accurate and timely reporting" and that an account owner could rely on the Reports to know the "exact status of all holdings secured at FSD." The Reports FSD sent to Customers indicated that their accounts held ASEs at all times. Those representations, taken together, were intended to give Customers the impression that all of their Leased Silver was physically and securely stored in their accounts at FSD at all times, and the impression that the Reports accurately stated the value of assets held in Customers' accounts.

52.     In fact, the exact opposite was the case. To the extent Defendants even obtained ASEs for Customers in the first place, Defendants' typical practice was for FSD to systematically transfer all of the Customers' ASEs to Argent and Higgins, and for Higgins to sell

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 16 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 15 of 33
PageID #: 24

those ASEs to third parties. This was typically done by moving metal from FSD's vault to Argent's offices at FSD, but on occasion it was simply accomplished by having metal delivered directly to Argent without ever being physically placed inside of FSD's vault.

53.     After this occurred, neither the Leased Silver, metal similar to the Leased Silver, nor assets roughly equivalent in value to the Leased Silver were returned to the Customers' account at FSD. Very little if any of the Leased Silver was actually stored in Customer accounts at FSD. Similarly, while some Leased Silver was temporarily stored in Argent's offices before being sold, Argent did not store the Leased Silver in its offices for long periods of time, and its offices did not contain anywhere close to the full number of ASEs pledged to the Programs. In addition, Argent did not maintain a reserve of cash in its bank accounts that would allow it to obtain all of the Leased Silver for Customers if needed.

54.     In other words, Defendants did not temporarily remove Leased Silver from Customer accounts to satisfy specific orders by third parties, and then replace the Leased Silver with other ASEs shortly thereafter, as Defendants led Customers to believe they were doing. Nor did Defendants replace Customers' ASEs with other assets of an equivalent value; this much is confirmed by the fact that the Reports FSD sent to Customers indicate that their accounts held ASEs, not other equivalent assets. Instead, Defendants misappropriated the Leased Silver, simply taking it and diverting it to their own use.

55.     None of this was disclosed to Customers by Defendants, either on the Reports or elsewhere. FSD repeatedly sent Customers false and misleading Holdings Reports showing that the Customers' ASEs were securely stored in their account at FSD, when in fact no such metal was there. Nothing in Defendants' contracts, communications, or other dealings with Customers authorized Defendants to misappropriate the Leased Silver, or authorized FSD to send these

false, misleading, and deceptive Holdings Reports.  FSD's failure to inform Customers that their

metal was not actually stored at FSD was also a deceptive omission, in light of their

representations to the contrary on the Holdings Reports.

56.     The monthly Activity Reports that FSD sent to Customers who elected to receive

their Silver Lease Payment in the form of additional ASEs were also false and misleading.

Those Activity Reports purported to show ASEs being added to Customers' accounts for the

Silver Lease Payment.  In actuality, FSD did not physically transfer ASEs into Customers'

accounts or physically move any ASEs at all.  Instead, FSD employees simply made electronic

entries in FSD's inventory management system, indicating that ASEs had been moved into

Customers' accounts.  These entries were "paper entries" with no corresponding actual

transaction, and the Activity Reports sent to Silver Lease Customers were false and misleading.

57.     Defendants' knew that the Reports were false and misleading or were reckless as

to their truth or falsity.  Defendants knew that the Leased Silver was not stored at FSD, and knew

that they were nonetheless sending Holdings Reports that gave Customers the contrary

impression.  As to the Activity Reports, Defendants made fictitious entries in FSD's inventory

management system with the knowledge that no metal had actually been moved to Customers'

accounts, and with the knowledge that the Customers would receive an Activity Report that gave

them the contrary impression.

58.     Defendants' misappropriation and deception was undoubtedly material.

Representations regarding the location and actual existence of a Customer's asset, and its

safekeeping by the party to whom it was entrusted, are of fundamental importance.  As FSD

itself acknowledged, "[w]e know that asset safety [and] transaction accuracy . . . are of

paramount importance to every depository customer."

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 18 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 17 of 33
PageID #: 26

**2.      Fraud and Deception Regarding the Acquisition of ASEs**

59.      Defendants' Scheme also involved several occasions in which Defendants never

obtained ASEs for Customers in the first place.  Defendants instead misappropriated the money

and assets they received for the purpose of purchasing ASEs, diverting those assets to Higgins'

personal use or the general use of FSD and Argent.

60.      In those instances, Defendants deceived Metals Dealer 1, Customers, and IRA

Custodians about their acquisition of ASEs.  Defendants deceived Silver Lease Customers

directly through the Reports.  They also deceived Metals Dealer 1 and IRA Custodians with the

knowledge that those parties would rely on Defendants' deception and make representations to

Silver Lease Customers that were misleading.  Defendants' deception involved issuing invoices

and purchase orders falsely indicating that Argent had obtained ASEs, falsely stating in

communications that ASEs had been obtained or were being delivered to Defendants' offices at

100 Todds Lane, and issuing Reports that indicated that ASEs had been deposited to Customers'

accounts.  Defendants knew that Argent had not in fact obtained those ASEs, but instead simply

created fake invoices and made fictitious "paper entries" in FSD's inventory management

system.

61.      For example, between October 1, 2018 and April 30, 2019, the number of ASEs

pledged to Metals Dealer 1's Silver Lease Program increased by more than 100,000.  The vast

majority of the new ASEs came from four separate Customers.  Those four Customers

collectively transferred more than $1.53 million of money or other assets to Metals Dealer 1 with

the understanding that those assets would be used to acquire ASEs for the Silver Lease Program.

Metals Dealer 1, in turn, wired funds and transferred assets to Argent with the understanding that

Argent would use those assets to acquire ASEs.

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 19 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 18 of 33
PageID #: 27

62.     The first Customer ("Customer 1") transferred gold and silver coins worth more than $280,000 to FSD in or around November 2018, in order to exchange those coins for 17,005 ASEs.  Two other Customers, who are related, ("Customer 2" and "Customer 3") each paid Metals Dealer 1 $129,500.00 (totaling $259,000.00) on or around January 11, 2019; Metals Dealer 1 transferred $251,650.00 of that to Argent to purchase 7,000 ASEs for each Customer. The last of these four Customers ("Customer 4") paid $1,000,000.00 to Metals Dealer 1 on or around February 6, 2019; Metals Dealer 1 transferred $993,959.35 to Argent to purchase 55,067 ASEs.

63.     Based on information provided by Defendants, Metals Dealer 1 told Customers that their transfer of cash or other assets was used to obtain actual, physical ASEs.  After completing Customer 1's exchange of other metal for ASEs, Metals Dealer 1 told him "your 17,005 ASE are on deposit."  Metals Dealer 1 told Customer 2 "you now own 7,000 American Silver Eagle coins on deposit," and sent Customer 3 an email "to confirm that your assets are on deposit at FSDC."  Metals Dealer 1 told Customer 4 that Metals Dealer 1 didn't have that many ASEs in inventory, so "we went out on the houses money . . . to procure the coins. . . Your assets will be on deposit in a 100% insured and segregated account within two weeks."

64.     In short, Argent obtained more than $1.53 million in assets—more than $1.24 million in cash, and close to $290,000 in precious metals—on the understanding that those assets would be used to obtain 86,072 ASEs for Customers 1-4.

65.     Instead of obtaining these ASEs for Customers 1-4, Higgins lied.  On January 23, 2019, an employee of Metals Dealer 1 asked Higgins when the orders for Customers 1, 2, and 3 (and two other Customers) would be fulfilled and when the ASEs would be in the Customers' accounts.  The employee of Metals Dealer 1 noted that Customers 2 and 3 had been waiting for

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 20 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 19 of 33
PageID #: 28

their ASEs for 9 days, Customer 1 had been waiting for his ASEs for 15 days, and another

Customer had been waiting for his ASEs for 36 days.  Collectively these Customers had

purchased more than 32,000 ASEs—one ton of silver.

66.     Higgins responded to the employee of Metals Dealer 1 to say that the ASEs were

going to be delivered to Defendants later that day, saying he had "confirmed a Brinks delivery

for today so between today/tomorrow you should see these accounts full."  During the Relevant

Period, Metals Dealer 1 had access to a portal on FSD's website that allowed it to view Silver

Lease Customers' holdings in fairly close to real time.  Metals Dealer 1 was clearly monitoring

these Customers' accounts closely on the portal, because two days after Higgins's response, the

employee of Metals Dealer 1 asked Higgins "if that Brinks truck ever made it to you" because he

"hadn't seen the accounts in full yet."  Higgins confirmed that "it was done this morning, you

should see in reports today."

67.     In fact, there was no Brinks truck, and no delivery of more than 32,000 ASEs to

Defendants on or around those days in late January by Brinks or other armored car services.

68.     Rather than obtaining ASEs for Customers 1-4, Defendants misappropriated their

assets and made fictitious entries in FSD's inventory management system, purporting to show

Argent delivering ASEs to Metals Dealer 1's account at FSD, and purporting to show ASEs

being transferred from Metals Dealer 1's account at FSD to Customer 1-4's accounts at FSD.

Defendants also sent false and misleading emails to Metals Dealer 1, Customers 1-4, and IRA

Custodian 1, purporting to show that the ASEs had been transferred into the accounts of

Customers 1-4 at FSD, and were stored there.

69.     Upon information and belief, these transactions were not the only time that

Defendants failed to obtain ASEs for Customers during the Relevant Period.  During the

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 21 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 20 of 33
PageID #: 29

Relevant Period, Argent received millions of dollars in Customer funds and assets for the purpose of obtaining ASEs. Argent did not use those funds to purchase silver on behalf of Customers, but instead misappropriated them by transferring them to Metals Dealer 1, Higgins, or entities associated with Higgins or his family. Argent may have used some Customer funds to purchase ASEs or other silver at various times; however, those transactions did not result in the storage of all of the required ASEs at FSD on behalf of Customers.

### 3.    Fraud and Deception through Misappropriation of Client Assets

70.    On at least one occasion during the Relevant Period, Defendants engaged in a scheme to defraud a group of Clients by misappropriating their assets and misleading them when the Clients attempted to withdraw their assets or transfer them to another depository.

71.    None of these Clients, who are related to each other, were part of the Programs or otherwise agreed that Defendants could lease, loan, rent, or use their assets without permission. To the contrary, FSD's agreements with these Clients provided that the assets were "deemed to be owned by Client and once credited to the Account, may be acted on by First State only upon receipt of a Formal Notice from Client."

72.    Upon information and belief, rather than abiding by that provision, Defendants took the Clients' assets without notice from the Clients or notification to them, and sold those assets for Defendants' own use.

73.    Several years later, the Clients asked that FSD and Higgins to return their assets promptly. In an attempt to cover up their misappropriation, FSD and Higgins offered a litany of misleading and deceptive excuses for why the assets could not be promptly returned; ignored multiple phone calls, emails, and texts from the Clients; refused to allow the Clients to inspect their assets as they are permitted under their agreements; and refused on two occasions to return

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 22 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 21 of 33
PageID #: 30

the assets to the Clients when the Clients physically travelled to Defendants' offices and demanded their assets.

74.     It took more than eight months for Defendants to return the assets that the Clients initially stored at FSD.  Moreover, at least some of the assets that were returned were not the same assets that the Clients initially stored, despite the fact that the Clients never authorized Defendants to remove, alter, trade, loan, lease, or replace the Clients' assets.

### 4.     Fraud and Deception Regarding Insurance

75.     On multiple occasions and through a variety of methods, Defendants led Customers and Clients to believe that their assets were insured for 100% of their value.  During the Relevant Period, FSD's publicly-visible website advertised that "[a]ll Accounts [are] Insured for 100% of value," stated that "assets are stored in insured accounts," and said that "First State is fully insured, with an approximate insured contents limit of $400 million, depending on the 'mix' of assets held."  In marketing materials and communications with potential Customers and Clients, FSD made similar assertions, stating, for example, that "[a]ll assets stored in First State's vaults are insured for 100% of its [sic] value through our ALL RISK policy with Lloyds of London."

76.     FSD made similar representations in the standard Depository Account Agreement it entered into with Customers and Clients, which provided that "First State agrees to maintain in effect all-risk insurance on Assets stored in Account for Client."  FSD's Depository Account Agreements also stated that upon request, FSD would "provide a Certificate of Insurance evidencing insurance coverage for Assets held by First State."  On numerous occasions Customers or Clients requested these certificates, which were referred to as "Evidences of Insurance."  The Evidences of Insurance listed FSD as the "Insured," and typically identified the Customer or Client as a "Memorandum Holder and Loss Payee."  When requested, FSD

21

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 23 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 22 of 33
PageID #: 31

provided these Evidences of Insurance, intending to reassure them that the Customer's and

Client's assets were fully insured.

77.     As explained below, Defendants' representations regarding insurance were false

and misleading.  At the time Defendants made these representations, they knew they were false

or were reckless as to their truth or falsity.  Defendants deceived Customers and Clients

regarding insurance in three main ways, the first two of which applied to all Customers and

Clients and the third of which applied only to Silver Lease Customers.

78.     *First*, despite the fact that throughout the Relevant Period FSD's website has

touted and continues to tout an "approximate insured contents limit of $400 million," in actuality

FSD's insurance policy limit has never been close to that from at least November 2014 through

the present.  To the contrary, FSD's insurance policy limit was $85 million from approximately

November 2014 to November 2016, $100 million from approximately November 2016 through

May 2021, and $75 million from May 2021 to present.  FSD's misrepresentations regarding the

purported $400 million insurance policy impacted all FSD Customers and Clients.

79.     Defendants knew their representations regarding a $400 million policy limit were

false, or were reckless as to their truth or falsity.  Defendants knew the actual limits of FSD's

insurance policies, and knew they were nowhere close to $400 million.  Defendants also knew

that their website contained inaccurate information regarding their policy limit.  Despite this

knowledge, Defendants do not appear to have taken any steps to correct the inaccuracy, given

that the same representation regarding the $400 million policy limit appears on FSD's website to

this day.

80.     *Second*, FSD's representations that "[a]ll Accounts [are] Insured for 100% of

value," that "First State is fully insured," and that "[a]ll assets stored in First State's vaults are

22

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 24 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 23 of 33
PageID #: 32

insured for 100% of its [sic] value" were false.  Not only did FSD not have a $400 million policy limit, FSD's actual, much lower policy limits were insufficient to cover the full value of assets that FSD purportedly held for Customers and Clients.  Like the misrepresentation regarding the $400 million insurance policy, this deception impacted all FSD Customers and Clients.

81.     For example, according to FSD records, as of March 2021 the total value of inventory stored at FSD was more than $176 million, and the total insured value of inventory was more than $158 million, at least $50 million more than the then-applicable policy limit of $100 million.  Likewise, in March 2022, when FSD's policy limit was $75 million, FSD's own records indicated that clients of 15 IRA Custodians collectively held more than $92 million in assets at FSD.  FSD has a substantial number of Clients whose assets are not administered by an IRA Custodian.  In other words, FSD's overall holdings were likely much larger than the $92 million administered by the 15 IRA Custodians, and presumably close to the $176 million from March 2021.  But even the IRA holdings alone were more than $17 million above FSD's policy limit.  Consequently, despite their representations, Defendants simply did not have sufficient insurance coverage to protect Customers and Clients.

82.     The insufficiency of FSD's insurance is supported by "monthly insurance reports" that FSD generated from internal records and provided to its insurance brokers and underwriters for use when renewing policies, setting limits, and determining premiums.  These reports vastly understated the value of assets that FSD purportedly held for Customers and Clients.  In March 2021, when FSD's own inventory system indicated it held more than $176 million in inventory, a FSD monthly insurance report suggested the total value of FSD's entire inventory was just $48,447,677.92, nearly $130 million lower.  In March 2022, when reports for the 15 IRA Custodians indicated that their clients collectively stored more than $92 million in assets at FSD,

Case 2:22-mc-00952    Document 1    Filed 10/07/22    Page 25 of 34
Case 1:22-cv-01266-RGA *SEALED*    Document 2 *SEALED*    Filed 09/27/22    Page 24 of 33
PageID #: 33

FSD's monthly insurance report indicated that the total value of FSD's entire inventory was $46,231,314.33, more than $46 million lower.

83.    Although the Commission has been unable to obtain records from Defendants recording the value of Customer and Client holdings at FSD throughout the Relevant Period, what sparse records do exist indicate that the monthly insurance reports were similarly inaccurate, and FSD was similarly underinsured, throughout the Relevant Period.  Clients of IRA Custodian 1 held more than $80 million of assets at FSD in March 2022, April 2021, and October 2020; more than $70 million in December 2019; and more than $63 million in assets in October 2018.  Despite this, FSD's monthly insurance reports for those months listed much lower values for *all* Customer and Client assets stored at FSD:  $46,231,314.33; $49,369,764.27; $49,431,316.05; $49,431,316.05; and $44,834,949.04, respectively.

84.    Because FSD did not just do business with a single IRA Custodian, FSD's understatement of inventory on the monthly insurance reports was likely far greater than the shortfalls suggested by the records related to IRA Custodian 1.  Upon information and belief, throughout the Relevant Period the disparity between the monthly insurance reports and the actual value of assets stored at FSD was similar to the disparity that existed in 2021 and 2022, and the actual value of FSD's inventory consistently exceeded FSD's policy limits.

85.    In short, Defendants' representations that all assets stored at FSD were fully insured for 100% of their value were false.  Defendants made those representations repeatedly: on FSD's website, in marketing materials, in communications with prospective Clients and Customers, in FSD's standard agreement with Clients and Customers, and elsewhere.  As with FSD's misrepresentations regarding the $400 million policy limit, FSD's misrepresentations that

all assets stored at FSD were insured for 100% of their value impacted all Clients, not just

Customers.

86.     Defendants knew these representations were false and misleading, or were

reckless as to their truth or falsity.  The size of the inconsistency between the policy limit and the

actual value of assets at FSD was so great that Defendants knew or were reckless as to their

representations truth or falsity.

87.     *Third*, FSD's provision of Evidences of Insurance to Customers was intended to

give the misleading assurance that Leased Silver was insured, when Defendants knew it was not

insured, or when the risk that the Leased Silver was not insured was so high that they must have

been aware of it.

88.     For the Relevant Period, FSD's primary insurance policy limit only covered assets

stored at 100 Todds Lane.  But as explained above, FSD and Argent's standard practice was not

to store the Leased Silver in FSD's vault at 100 Todds Lane (to the extent it was bought in the

first place), but instead to systematically and immediately transfer those ASEs to Argent's

offices at 100 Todds Lane, where the Leased Silver was briefly stored before being sold to third

parties.  None of FSD's insurance policies covered Leased Silver that was sold by Argent,

delivered to third parties, and removed from the possession, custody, or control of FSD and

Argent.  Defendants' provision of Evidences of Insurance upon request thus provided false

assurances to Customers that the Leased Silver was covered by FSD's insurance policies.

89.     Defendants knew the assurances they made by obtaining and sending these

Evidences of Insurance to Customers were false and misleading, or were reckless as to their truth

or falsity.  As noted above, Defendants knew that their regular and standard practice was for FSD

to transfer Leased Silver to Argent and for Argent to sell the Leased Silver to third parties.

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 27 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 26 of 33
PageID #: 35

Defendants knew that their insurance policies did not apply to Leased Silver that had been sold by Argent and removed from 100 Todds Lane, or that was never bought in the first place. Defendants deceived Customers by nonetheless agreeing to provide, and on numerous occasions actually providing, Evidences of Insurance to Customers purporting to assure them that their Leased Silver was insured.

90.     All three of the categories of insurance misrepresentations described above were material to Customers and Clients, for whom insurance is and was an essential aspect of asset security and protection.  In the field of precious metals investments, insurance coverage is one of the biggest factors that customers consider when determining where to store their assets.  At least one Customer switched to FSD from another depository because FSD claimed to maintain 100% insurance, whereas a competitor only maintained 70% insurance.  The materiality of Defendants' insurance misrepresentations is further emphasized by the prominence Defendants give to insurance in marketing materials, the fact that FSD specifically agreed to provide insurance in its Depository Account Agreements, the repeated questions that Defendants received from Customers, Clients and prospective Clients regarding the scope and coverage of insurance, and by the requests Defendants' received for certificates evidencing the insurance that purportedly covered Customer and Client assets.  Defendants lied and misled Customers and Clients about their insurance coverage repeatedly throughout the Relevant Period, and in doing so both deceived Customers and Clients, and exposed them to substantial risk that those Customers and Clients were not aware of.

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 28 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 27 of 33
PageID #: 36

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021)

91.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

92.     The precious metals discussed in this Complaint are commodities as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

93.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

[U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act].

94.     Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) provides, in part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

95.     During the Relevant Period, as described above, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3) by, among other things, in connection with contracts of sale of commodities in interstate commerce (e.g., silver), using or employing, or attempting to use or employ, a device, scheme, or artifice to defraud and engaging, or attempt to

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 29 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 28 of 33
PageID #: 37

engage, in an act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, including by:

    a. Misappropriating Customer funds that were sent to Argent for the purpose of obtaining ASEs, and instead diverting those funds to Higgins' personal uses or the general use of FSD and Argent;

    b. Misappropriating metal owned by Silver Lease Customers and other Clients;

    c. Leading Metals Dealer 1, other Customers, and IRA Custodians to believe that ASEs had been obtained for the Programs, and that ASEs for the Programs were stored at FSD, when in fact they were not; and

    d. Leading Metals Dealer 1, other Customers, IRA Custodians, and Clients to believe that their assets were fully insured for 100% of their value, when in fact they were not.

96. During the Relevant Period, Defendants, by and through Higgins and others, violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3), by, among other things, in connection with contracts of sale of commodities (e.g., silver) in interstate commerce, making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading, including by:

    a. Making false and misleading statements that ASEs and Client assets were stored at FSD when in fact they were not;

    b. Making false and misleading statements that ASEs had been acquired for the Programs when in fact they had not;

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 30 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 29 of 33
PageID #: 38

    c.   Making false and misleading statements regarding insurance coverage that applied to the Leased Silver and other Client assets; and

    d.   Making false and misleading statements in connection with certain Clients' attempts to retrieve their assets from FSD.

97.    Defendants engaged in the acts and practices described above willfully, knowingly or with reckless disregard for the truth.

98.    Each act in furtherance of: (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; or (3) engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) and Regulation 180.1(a)(1)-(3).

99.    The foregoing acts, omissions, and failures of Argent's employees and agents, including Higgins and others , have occurred within the scope of their employment, agency, or office with Argent.  Therefore, Argent is liable, pursuant to Section 2(a)(l)(B) of the Act, 7 U.S.C. § 2(a)(l)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021), as principal for the violative actions and omissions of Argent's employees and agents.

100.    The foregoing acts, omissions, and failures of FSD's employees and agents, including Higgins and others, have occurred within the scope of their employment, agency, or office with FSD.  Therefore, FSD is liable, pursuant to Section 2(a)(l)(B) of the Act and Regulation 1.2, as principal for the violative actions and omissions of FSD's employees and agents.

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 31 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 30 of 33
PageID #: 39

101.    Higgins directly or indirectly controlled Argent and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Argent's violations of 7 U.S.C. § 6(c)(1) and Regulation 180.1(a)(1)-(3).  Higgins is therefore liable for Argent's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

102.    Higgins directly or indirectly controlled FSD and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting FSD's violations of 7 U.S.C. § 6(c)(1) and Regulation 180.1(a)(1)-(3).  Higgins is therefore liable for FSD's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

103.    Because FSD and Argent operated as a common enterprise, each is liable for the violative acts of each member of the enterprise.

104.    Higgins controlled the common enterprise and did not act in good faith, or knowingly induced, directly or indirectly the acts constituting the common enterprise's violations of 7 U.S.C. § 6(c)(1) and Regulation 180.1(a)(1)-(3).  Higgins is therefore liable, as control person, for the violative acts of each member of the common enterprise.

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.  Enter an order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021);

B.  Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants and any other person or entity in active concert with them, from engaging in conduct in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3);

C.  Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 32 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 31 of 33
PageID #: 40

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3) Having any commodity interests traded on any Defendant's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9);

D. Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees,

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 33 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 32 of 33
PageID #: 41

revenues, and trading profits derived, directly or indirectly, from acts or practices

which constitute violations of the Act and Regulations as described herein, including

pre-judgment and post-judgment interest;

E.  Enter an order requiring Defendants, as well as their successors, to make full

restitution to every person who has sustained losses proximately caused by the

violations described herein, including pre-judgment interest and post-judgment

interest;

F.  Enter an order directing Defendants and any of their successors, to rescind, pursuant

to such procedures as the Court may order, all contracts and agreements, whether

implied or express, entered into between them and any of the Customers and Clients

whose funds were received by them as a result of the acts and practices which

constituted violations of the Act, as amended, as described herein;

G.  Enter an order directing each Defendant to pay a civil monetary penalty, to be

assessed by the Court, in an amount not to exceed the penalty prescribed by Section

6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the

Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L.

114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R.

§ 143.8 (2021), for each violation of the Act and Regulations, as described herein;

H.  Enter an order directing that Defendants, and any successors thereof, conduct a

physical audit and make an accounting to the Court of all of their assets and

liabilities, together with all funds they received from and paid to Customers, Clients,

and other persons in connection with commodity interests and all disbursements for

any purpose whatsoever of funds received from commodity interests, including

Case 2:22-mc-00952   Document 1   Filed 10/07/22   Page 34 of 34
Case 1:22-cv-01266-RGA *SEALED*   Document 2 *SEALED*   Filed 09/27/22   Page 33 of 33
PageID #: 42

salaries, commissions, interest, fees, loans, and other disbursement of money or

property of any kind from at least April 2016 to the date of such accounting;

I.  Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2413(a)(2); and

J.  Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Dated:  September 27, 2022                     Respectfully submitted,

Brian A. Hunt
*bhunt@cftc.gov*

Michael Solinsky
*msolinsky@cftc.gov*

COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street NW
Washington, DC 20581
Tel:  (202) 418-5000